AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original



# UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America

v.

SARKIS SARISYAN,
  aka "Samuel Shaw,"
MIKHAEL MIKHAELYAN,
ARSEN TERZYAN,
  aka "Steven Terzaki,"
SARKIS YEMENEJIAN, and
MARIANNA SARKISYAN,

        Defendants

Case No.  2:25-MJ-03138-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of between April 1, 2020 and June 30, 2022, in the county of Los Angeles in the Central

District of California, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 286 | Conspiracy to Defraud Government with Respect to Claims |
| 18 U.S.C. § 287 | False, Fictitious or Fraudulent Claims |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| 18 U.S.C. § 1956(a)(1) | Laundering of Monetary Instruments |
| 18 U.S.C. § 1957 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |

//

//

//

AUSAs: Mark Aveis (x4477), Gregg Marmaro (x8500)

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Eric Ley, Special Agent*
*Complainant's signature*

Eric Ley, Special Agent, Office of Inspector
General, U.S. Small Business Administration
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      May 23, 2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSAs: Mark Aveis (x4477), Gregg Marmaro (x8500)

## Contents

I.    INTRODUCTION...........................................3

II.   PURPOSE OF AFFIDAVIT...................................4

III.  SUMMARY OF PROBABLE CAUSE.............................7

IV.   PROBABLE CAUSE........................................7

    A.   The Paycheck Protection Program...................7

    B.   The Economic Injury Disaster Loan Program........9

    C.   PPPL Forgiveness................................11

    D.   Restaurant Revitalization Fund Grants..........12

    E.   SUBJECT SHAW: Wire Fraud, Bank Fraud, and Money
       Laundering re "Prime" PPPL.....................13

       1.   SHAW's Background.........................13

       2.   Offense Conduct re "Prime" PPPL...........15

       3.   Wire Fraud re Prime's PPPL Forgiveness
          Application...............................19

    F.   SUBJECT MIKHAELYAN: Wire Fraud, Bank Fraud, and
       Money Laundering re "Cornwall" PPPL............20

    G.   SUBJECT MIKHAELYAN: Wire Fraud and False Claim re
       Cornwall EIDL..................................24

    H.   SUBJECTS MIKHAELYAN and YEMENEJIAN: Wire Fraud,
       False Claim, and Money Laundering re "Nairi" RRF
       ...............................................25

    I.   MIKHAELYAN: Wire Fraud and False Claim re "Rest"
       EIDL Modification..............................28

    J.   SUBJECT YEMENEJIAN: Wire Fraud and False Claim re
       "Tiny Tots" EIDL..............................30

    K.   SUBJECT TERZYAN: Wire Fraud, False Claim, and
       Money Laundering re "Grub House" EIDL and EIDL
       Modification...................................34

    L.   SUBJECT TERZYAN: Wire Fraud, False Claim, and
       Money Laundering re "Grub House" RRF...........37

    M.   SUBJECT MARIANNA: Wire Fraud, False Claim, and
       Money Laundering re "Rustwood" EIDL............42

N.    SUBJECT MARIANNA: Wire Fraud and False Claim re
Personal EIDL...................................45

V.    CONCLUSION.......................................47

## **AFFIDAVIT**

I, Eric Ley, being duly sworn, declare and state as follows:

## **I.  INTRODUCTION**

1.   I have been a federal agent for more than 12 years. Since May 2021, I have been a Special Agent of the U.S. Small Business Administration ("SBA"), Office of Inspector General ("SBA-OIG").  Before that, I was a Special Agent with the United States Secret Service for eight years.

2.   Since graduating from the Criminal Investigator Training Program conducted at the Federal Law Enforcement Training Center, I have over ten years of experience investigating various criminal offenses including bank fraud, wire fraud, and money laundering.  As such, I have interviewed hundreds of witnesses and targets, participated in the execution of numerous search and arrest warrants relating to financial crimes, and worked with federal prosecutors to prepare investigations for prosecution.

3.   For the past four years, I have focused on investigating crimes associated with SBA-related loan and guarantee programs including pandemic stimulus funding, sometimes referred to as Covid-19 fraud.  From reviewing dozens of pandemic stimulus loan files and documents associated with those files such as subpoenaed bank records and public records, I have become familiar with the processing and vetting of applications under the Paycheck Protection and Economic Injury

Disaster Loan programs, among other pandemic-related funding programs.

4.    Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods employed by those who conduct wire fraud schemes using fraudulent loan statements and fabricated documents, money laundering, and identity theft, among other federal offenses.  These methods include, but are not limited to, the use of wireless communications technology, such as encrypted messaging platforms such as "WhatsApp;" the creation or purchase of corporate "shells," i.e., corporations that have been formed through the filing of articles of incorporation but conduct no business and are used solely to create the appearance of legitimacy; fabricating bank statements or other business documents to satisfy lender underwriting requirements to qualify for loans; and moving funds through multiple accounts to promote and conceal fraud.

## II. **PURPOSE OF AFFIDAVIT**

5.    This affidavit is made in support of a criminal complaint against, and request for issuance of arrest warrants for, the following individuals (also, where context requires, by "SUBJECT [NAME]," or collectively, the "SUBJECTS"), for violations of 18 U.S.C. §§ 286/287 (conspiracy to defraud the government with respect to claims/make false claims), 1343 (wire fraud), 1344 (bank fraud), 1956(h) (money laundering conspiracy), 1956(a)(1) *et seq.* (money laundering), 1957 (engaging in monetary transactions in property derived from

4

specified unlawful activity), and/or 31 U.S.C. §§ 5313, 5324 (structuring) (collectively, the "Subject Offenses") as more fully described below:

SARKIS SARKISYAN, AKA SAMUEL SHAW ("SHAW");

MIKHAEL MIKHAELYAN ("MIKHAELYAN");

ARSEN TERZYAN, AKA STEVEN TERZAKI ("TERZYAN");

SARKIS YEMENEJIAN ("YEMENEJIAN"); and

MARIANNA SARKISYAN ("MARIANNA").

6.    The facts set forth in this affidavit are based on my personal observations; my training and experience; witness interviews that I have conducted; reports that I have read of interviews conducted by other law enforcement agents; my review of documents obtained from third parties, either by way of subpoena or voluntary submission, such as bank or business records; my review of publicly-filed documents such as corporate filings; Internet searches for open source information; financial analyses or financial records summaries prepared by a SBA analyst who told me that she reviewed and prepared such analyses and summaries from bank and other financial records obtained in this investigation, and whom I believe to be qualified to make such analyses and summaries from having worked with her for several years and having reviewed her work product in other matters; and my review of documents created or amassed by the SBA in connection with providing funding for the various loans and grants more fully described below.  Accordingly, absent mention below of specific attribution from any of the

above-summarized evidence, I have, solely for clarity, generally
omitted attribution for a specific fact.

7.    Whenever I refer herein to a bank, I mean a financial
institution whose deposits were insured by the Federal Deposit
Insurance Corporation.  Whenever I refer herein to bank records,
I have done so by identifying each account by an abbreviation
for the bank followed by the account's last four digits, e.g.,
"JPMC 1234."  Whenever I refer to the substance or content of
such accounts, such reference is based on my review of the
records of the account(s), including bank statements, signature
card/account application documents, canceled checks, offset and
credits, and other records provided by each bank pursuant to a
grand jury subpoena.  Similarly, unless stated otherwise,
whenever I refer to records of or relating to the SBA, I am
referring to SBA records that I have reviewed as accessible to
me in my capacity as a Special Agent of the SBA-OIG.

8.    My description of the offense conduct below is based
on my review of the above-summarized evidence and is provided
solely for the purpose of establishing probable cause to believe
that one or more of the above-stated offenses were committed by
the SUBJECTS.  Accordingly, I have not described all of the
evidence that I have reviewed during the course of this
investigation and my omission of evidence or mention of other
subjects or targets of this investigation should be considered
in that light.

9.    Unless stated otherwise, all conversations and
statements described in this affidavit are related in substance

and/or in part only; all dates are "on or about" or
approximations; all amounts are rounded or close approximations;
and the words "on or about" and "approximately" are omitted for
clarity.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.    I have probable cause to believe that the SUBJECTS
committed the Subject Offenses by creating, purchasing, or using
corporations for use in name only, <u>i.e.</u>, as "shells"; opening
and assisting others in opening one or more bank accounts in the
names of those shells; submitting and assisting others to submit
fraudulent applications to obtain millions of dollars in
pandemic stimulus funding; creating and submitting fake
documents in support of those fraudulent applications; and
laundering and directing others to launder the proceeds of such
funding through multiple bank accounts for, ultimately, personal
use.

### IV. <u>PROBABLE CAUSE</u>

**A.    The Paycheck Protection Program**

11.    The Coronavirus Aid, Relief, and Economic Security
("CARES") Act was a federal law enacted in or about March 2020
that was designed to provide emergency financial assistance to
Americans suffering economic harm as a result of the COVID-19
pandemic.  One form of assistance provided by the CARES Act was
the authorization of United States taxpayer funds in the form of
loans to small businesses for job retention and certain other
expenses, through a program referred to as the Paycheck
Protection Program ("PPP;" loans under that program are

7

sometimes referred to herein as a "PPPL" or "PPPLs").  PPPL proceeds were required to be used by the applicant business to pay certain expenses such as payroll costs, interest on mortgages, rent, and utilities.

12.  In order to obtain a PPPL, a qualifying business was required, among other things, to submit a PPPL application that required the applicant business (through its authorized representative) to acknowledge PPP program rules and make certain affirmative certifications that the applicant business would comply with all such rules to be eligible to obtain a PPPL.  Such certifications required, among other things, that the applicant affirm that "[PPP] funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments," and that the "loan proceeds will be used only for business-related purposes as specified in the [PPPL application]" and consistent with PPP rules.  The authorized representative of the applicant was also required to certify that "the information provided in th[e] PPP application and the information provided in all supporting documents and forms is true and accurate in material respects," and that "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

13.  A PPPL applicant's representative was also required to state, among other things, the applicant's average monthly payroll expenses and number of its employees.  These figures were used to calculate the amount of money that the business was

eligible to receive under the PPP. In addition, the applicant's representative was required to provide documentation showing its payroll expenses and such other documentation as the SBA or the lender requested.

14. A PPPL application and supporting documents were submitted online through a portal and processed by a participating lender. The applicant's representative confirmed his/her true identity through a variety of means including providing personal identifying information, uploading a copy of that person's driver's license and/or Social Security card, and/or executing loan documents via a document authentication platform such as DocuSign. If a PPPL application was approved, the participating lender would fund the PPPL using its own funds and would wire-transfer those funds to a bank account designated by the applicant. By wire-transferring the loan proceeds to that designated account, the lender, the SBA and, ultimately, law enforcement would have yet another way to ensure that the application was sought by the stated applicant through his/her duly acting representative and that the applicant received and used those funds in accordance with PPP rules.

15. If PPP lending criteria were followed by the lender, the SBA, in turn, guaranteed the borrower's repayment in the event of that borrower's default.

**B.    The Economic Injury Disaster Loan Program**

16. In addition to the PPP, the CARES Act authorized taxpayer funds under the Economic Injury Disaster Loan program (individually, an "EIDL," or collectively, "EIDLs"). The EIDL

program provided low-interest funding to small businesses,
renters, and homeowners affected by the COVID-19 pandemic.

17.   In order to obtain an EIDL, a qualifying business was
required to submit an application to the SBA, typically through
an online portal, and provide information about its operations,
such as the nature of the applicant's business, e.g.,
"agriculture," the number of employees, and gross revenues for
the 12-month period preceding the Covid-19 pandemic.  Like
PPPLs, EIDL applicants were required to certify that all
information in the application as provided by the applicant or
on behalf of the applicant by their authorized representative
was true and correct.

18.   An EIDL "Loan Authorization and Agreement" ("LA&A")
was executed by the applicant's authorized representative as a
condition of receipt of EIDL proceeds that stated that.  The
LA&A required that the applicant use the EIDL proceeds only for
purposes stated in EIDL rules, such as for employee payroll
expenses, employee sick leave, and business obligations and
expenses such as business debts, rent, and mortgage payments.
EIDL funds could not be used other than for those purposes,
including that such funds could not be deposited or held for
future business operations, used to capitalize a new business or
for business start-up expenses, or used for purposes not
associated with the operation of a going concern.

19.   The amount of an EIDL was determined, in part, by the
applicant's representations in the EIDL application about the
nature of the applicant's business and the applicant's

statements about employees, and revenue.  Any funds paid under
an EIDL were issued directly by the SBA from CARES Act
appropriations by Congress.

20.    If the EIDL applicant also obtained a PPPL, EIDL
proceeds could not be used for the same purpose as the PPP loan
proceeds.

21.    PPP and EIDL applicants were also obligated to
provide true and correct information in response to requests by
PPP lenders or the SBA as part of the PPPL and EIDL vetting
process, such as requests to clarify business ownership and
requests to provide genuine payroll tax documents such as IRS
Forms 940, 941, or W3 "Transmittal of Wage and Tax Statements."

**C.    PPPL Forgiveness**

22.    Under certain circumstances, PPPL borrowers were
entitled to forgiveness of their PPP obligations.  As a
condition of forgiveness, borrowers were required to complete a
"PPP Loan Forgiveness Application" on which their authorized
representative represented and certified that the borrower had
complied with all PPP rules "including the rules related to  . .
. eligible uses of PPP loan proceeds[]" and that "[t]he
information provided in th[e forgiveness application was] true
and correct in all material respects."  The forgiveness
application warned that "knowingly making a false statement to
obtain forgiveness was a federal crime, punishable by
imprisonment and/or a fine."

23.    I know from my training and experience, and from
evidence gathered in this case, that PPPL lenders and the SBA

11

relied on an applicant's truthfulness in statements made on applications and related documents, and on the genuineness of documents submitted by applicants in support of applications, to determine whether to approve PPPLs or EIDLs.

**D.   Restaurant Revitalization Fund Grants**

24.   In March 2021, the American Rescue Plan Act became law and established the Restaurant Revitalization Fund ("RRF") for which Congress appropriated $28.6 billion for the SBA to award emergency assistance to qualifying businesses that served food or drink, essentially restaurants.  Entitlement was substantially based on pandemic-caused revenue loss.  The RRF was a conditional grant program, meaning that RRF recipients were not required to repay the funds so long as those funds were used for specific expenses and by a certain deadline.

25.   RRF applicants submitted personal and business information, typically through an online SBA portal, in support of each RRF application.  Among other things, applicants were required to list all owners of 20% or more of the business.  The listing for each owner required the owner's Employer Identification Number ("EIN"), Social Security number, or "Individual Taxpayer Identification Number."

26.   The SBA prioritized RRF awards to small businesses at least 51% owned and controlled by women, veterans, and/or the socially and economically disadvantaged.

27.    RRF recipients were required to certify that they would use RRF proceeds for normal business operations such as for payroll costs, health care, business mortgages or rent. Recipients were then required to submit a "post-award report" in which they certified that their RRF proceeds were used in compliance with the program.

**E.    SUBJECT SHAW: Wire Fraud, Bank Fraud, and Money Laundering re "Prime" PPPL**

1.    <u>SHAW's Background</u>

28.    In 2011, SHAW, under his given name Sarkis Gareginovich Sarkisyan, was convicted in Santa Clara Superior Court, case no. B1151803, of unauthorized access to computers (Cal.Pen.C. sec. 502(c)(1)), theft of credit card information (Cal.Pen.C. sec. 484e), counterfeiting credit cards (Cal.Pen.C. 484i), and conspiracy (Cal.Pen.C. sec. 182).  In 2023, SHAW changed his name from Sarkis Gareginovich Sarkisyan to Samuel SHAW.  Genuine images of SHAW'S prior and latest driver's license are below:

 

29.    SHAW is the brother-in-law of SUBJECTS MIKHAELYAN and TERZYAN.

13

30.    SHAW has fraudulently claimed that he is the victim
of identity theft by lying about his income and employment to
obtain credit, failing to pay such debt, and then years later
claiming the debts were not his.  I reviewed documents provided
by BMW Financial Services ("BMW"), and spoke with Homeland
Security Investigations analyst Michael Reid, and learned the
following:

a.    In 2014, SHAW financed the purchase of a new BMW,
in connection with which he provided his true Social Security
number and listed his true residence address (the same address
that, as more fully discussed below, he provided in connection
with several fraudulent loan applications).  He claimed an
annual salary of $876,000 as an employee of "Nairi Restaurant"
(a business for which, as more fully discussed below, SHAW's
brother-in-law, MIKAELYAN, and another SUBJECT, YEMENEJIAN,
fraudulently obtained an RRF and by which SHAW was never
employed).  I know from other documents in this case, also more
fully discussed below, that SHAW during that same time period
(2012 to 2020) fraudulently claimed that he was an "IT
Specialist."

b.    SHAW paid loan installments on the BMW loan for
approximately five years from a bank account that he controlled.

c.    In 2018, SHAW submitted a report under penalty of
perjury to the Federal Trade Commission that he was the victim
of identity theft with respect to the BMW loan and other debts.

d.    SHAW then sent a letter to Equifax (a credit
reporting agency) in which he claimed that he was the victim of

14

identity theft relating to credit accounts (<u>e.g.</u>, Macy's and Bloomingdale's).  Attached to SHAW's letter to Equifax was what appeared to be a Long Beach Police Department ("LBPD") report that indicated that SHAW had reported his identity theft to LBPD.  The report indicated that SHAW provided to LBPD the same purportedly misused credit accounts, including BMW (an account on which SHAW had paid installments for several years before claiming that his identity was stolen).

     e.   HSI Analyst Reid told me that he provided LBPD a copy of the purported LBPD report that SHAW had sent to Equifax.  An LBPD employee responded that the purported report that SHAW had sent to Equifax was fake as the LBPD number on the purported report did not match the genuine report number in LBPD's files and that the purported report appeared to have been altered.

### 2.   <u>Offense Conduct re "Prime" PPPL</u>

31.   Prime Funding, Inc. ("Prime") was incorporated in 2018 and, in January 2021, its business address was updated in California corporation records to 7011 Liberty Drive, Van Nuys, CA (the "Liberty Address"), an address that I know from SHAW's driver's license and other sources to be SHAW's personal residence at all times relevant to this affidavit.

32.   Three months later, in April 2021, an application was submitted online for a PPPL on behalf of Prime.  The application identified SHAW as Prime's authorized representative and contained SHAW's driver's license, Social Security number, and the Liberty Address.  The stated reason for the PPPL was to cover Prime's payroll costs for 57 employees at an average

monthly payroll of $314,583.  The applicant submitted what appeared to be genuine Internal Revenue Service ("IRS") Forms 941 (quarterly payroll tax returns) that identified the Liberty Address as Prime's business address.

33.    I reviewed a response from the IRS pursuant to a law enforcement "Fact of Filing" request that is commonly used in these investigations to determine if IRS-related documents were actually filed with the IRS.  I learned that none of the Forms 941 submitted on behalf of Prime in connection with the PPPL was actually filed with the IRS.

34.    I also know from my training and experience that the California Employment Development Department ("EDD") maintains records of wages paid to employees.  I reviewed EDD records for Prime and learned that Prime had never reported the payment of any wages.

35.    The applicant for the Prime PPPL also provided as part of the PPP underwriting process what purported to be payroll reports prepared by a third-party payroll processor called "Paylocity," an entity that I know to be similar to payroll processor ADP.  The reports listed 56 names of individuals who were purportedly employed by Prime with titles like "customer service," "sales," or "admin."  I received information from Paylocity that Paylocity never did any payroll work for Prime and that the reports were fake.  Below is an image of one such report, showing gross wages of $1,539,526, that was submitted by the applicant for the Prime PPP:

| Payroll Report | | | | | | | | | | Page 2 of 3 |
| PRIME FUNDING (103369) | | | | Payroll Report: 04/16/2021 TO 08/31/2021 | | | | | | |
| Company ID | Company Name | Employee ID | Employee Name | Cost Center | Gross Wages this Period | Gross Annual Salary | Monthly Average Wages | Medicare tax withheld | Social security tax withheld | Federal income tax withheld |
|---|---|---|---|---|---|---|---|---|---|---|

*(Detailed payroll data rows for Prime Funding employees, from Paylocity Corporation (888) 873-8205. Run on 09/15/2022 at 12:47 PM.)*

36.   The applicant for the Prime PPPL designated a JPMorgan Chase Bank ("JPMC") account ending in 6026 (the "JPMC 6026") to receive the proceeds of Prime's PPPL.  I know that PPPL, EIDL, and RRF applicants were required to designate a bank account to which funds would be wire-transferred to the applicant.

37.   An individual identifying himself as SHAW electronically, via the DocuSign authentication platform, acknowledged and then electronically transmitted to the lender, JPMorgan Chase, a standard form PPPL certification that stated, among other things, that PPPL proceeds would solely be used by Prime to retain employees and for certain of its business expenses.

38.   Prime's PPPL was approved and funded by JPMorgan Chase in April 2021, for $786,457, with a wire transfer in that amount.  I reviewed bank records for JPMC 6026 that showed the wire-transfer deposit of the Prime PPPL proceeds, and learned the following:

a.    The balance in the JPMC 6026 was $173 before the PPP proceeds were deposited.

b.    SHAW was the sole signatory on the 6026 Account. The signature card/account application identified SHAW by his true name, Social Security number, and date of birth.  His signature matched that of his driver' license.

c.    Within six weeks of the deposit, substantially all of the Prime PPPL proceeds were withdrawn or transferred out of the account.

d.    SHAW made more than $50,000 in cash withdrawals from the JPMC 6026 following the PPPL proceeds deposit, including four such withdrawals just under $10,000.  Based on my training and experience, I believe that those transactions indicated that transactions were structured to ensure that the bank did not submit Currency Transaction Reports to the U.S. Treasury Department.[1]

e.    There were no payments to any payroll company for Prime, nor were there any checks or transfers to any of the

---

[1]    The following legal authority was provided by the AUSA:

Federal law requires banks and other financial institutions to file reports with the Secretary of the Treasury whenever they are involved in a cash transaction or exchange of currency that exceeds $10,000.  "A person who willfully violates this law is subject to criminal penalties."  31 U.S.C. §§ 5313, 5324; 31 CFR § 103.22(a),(b)(2006 Ed.); *Ratzlaf v. United States*, 510 U.S. 135, 136 (1994); *see also, United States v. Turner*, 400 F.3d 491, 497 (7th Cir. 2005)(in case charging conspiracy to launder money, "we know that certain types of transactions may be indicative of a design to conceal.  These include transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction.").

names of purported Prime employees listed on the "Paylocity" reports.

        f.   Out of PPPL proceeds, SHAW wrote a $49,569 check (the signature on the check matches that of SHAW's driver's license) to "Humboldt Wholesale, Inc.," which, on further investigation, appeared to be a supplier of items to cultivate marijuana.  See, e.g., https://www.dnb.com/business-directory/company-profiles.humboldt_wholesale_inc.cd260285658c4f8a89458e6c479d928e.html.

        g.   Out of the Prime PPPL proceeds in the JPMC 6026, SHAW also made large online payments to individuals whom I identified as friends or neighbors of SHAW's father and who were not identified on either the fake Paylocity or EDD records as associated with or employed by Prime:

        April 29, 2021 – June 8, 2021 - $90,000.00  to E.T.

        May 24, 2021 – June 9, 2021 - $17,468.00  to T.T.

        May 24, 2021 – June 9, 2021 - $17,532.00  to A.T.

    3.   Wire Fraud re Prime's PPPL Forgiveness Application

39.   In June 2022, an application was submitted online to forgive Prime's PPPL.  "Sarkis G. Sarkisyan" (whose name matches that on SHAW's previous driver's license, depicted above) was identified as the "primary contact" on the forgiveness application and the Liberty Address was provided as Prime's "business address."  The forgiveness application was electronically signed by "Sarkis Sarkisyan" as Prime's

"authorized representative." Based on this evidence and the evidence that shows that SHAW controlled and misused the Prime PPPL proceeds, described above, I have probable cause to believe that SHAW submitted this forgiveness application and will refer to that application as such.

40.   SHAW was required to certify that the Prime PPPL proceeds were "used to pay business costs that are eligible for forgiveness," such as payroll costs to retain employees. SHAW stated that Prime's payroll costs were $1,539,526.58, an amount that matched that of the payroll costs on the phony Paylocity payroll report submitted to support the PPPL, as described above.

41.   Again, in reviewing bank records showing the wire transfer of the Prime PPPL proceeds to the JPMC 6026, I did not see any withdrawals or transfers that appeared to be for Prime's payroll.

**F.    SUBJECT MIKHAELYAN: Wire Fraud, Bank Fraud, and Money Laundering re "Cornwall" PPPL**

42.   On May 20, 2020, an application for a PPPL was submitted on behalf of the "Cornwall Group, Inc." ("Cornwall").

43.   Public records show that MIKAELYAN was Cornwall's sole officer and director, and at various times in public records its stated business was "management" or "water restoration."

44.   Contrary to the above-described public records, Cornwall's PPPL application stated that Cornwall was a

"miscellaneous store retailer," had 81 employees, and had an average monthly payroll of $357,541.

45.   The applicant also submitted various documents in support of the application, including, similar to SHAW's PPPL application for Prime, an IRS Form 941.  Here, that form reported that Cornwall had paid wages in the first quarter of 2020 in excess of $1 million.

46.   I submitted an IRS Fact of Filing request for Cornwall and from that response confirmed that no such form was actually submitted to the IRS.

47.   The applicant also submitted a payroll report purportedly from Paylocity, the same payroll company whose payroll report SHAW had fabricated.  The report listed purported Cornwall employees and their wages.  I learned from EDD that EDD has no record of the purported employees and from Paylocity that it had no records for Cornwall.

48.   An individual identifying himself as MIKHAELYAN electronically, via the DocuSign authentication platform, acknowledged and then electronically transmitted to the lender, Bank of America, a standard form PPPL certification that stated, among other things, that PPPL proceeds would solely be used by Cornwall to retain employees and for certain of its business expenses.

49.   Bank of America approved the Cornwall PPPL application and funded the loan of $893,852 in May 2020.  I reviewed records from Bank of America for a Bank of America

21

account ending in 7587 (the "BofA 7587") into which the Cornwall PPP proceeds were deposited.  I learned the following:

        a.    An individual identifying himself as MIKHAELYAN opened the BofA 7587 in 2017.  The signature card/account application identified MIKHAELYAN by his true date of birth and genuine Social Security and driver's license numbers.

        b.    MIKHAELYAN was the sole signatory on the BofA 7587.  The signature on the signature card matches that of MIKHAELYAN on his genuine driver's license.

        c.    The balance just before the deposit of the Cornwall PPP loan proceeds was *de minimus*.

        d.    Substantially all of the Cornwall PPPL proceeds were withdrawn in the form of checks within about a week of the proceeds' deposit, including a $40,000 check to the Los Angeles Rams.  The signatures on that check (and each check) matched that of MIKHAELYAN's driver's license:



50.    In August 2021, an application was submitted for forgiveness of the entire Cornwall PPPL.  The application electronically certified, in a manner similar to the initial PPPL certification, that Cornwall had 82 employees at the time

of the forgiveness application and that the PPPL proceeds were used for Cornwall's business expenses including 60% for payroll.

    51.   I also saw a check within the BofA 7587 records, that I believe bore MIKHAELYAN's genuine signature, for $479,000. The check bore the notation "PPP payroll" (the "PPP Payroll Check"):



    52.   The balance in the BofA 7587 at the time of the PPP Payroll Check consisted substantially of unspent Cornwall PPPL loan proceeds.   I traced the deposit of the PPP Payroll Check to a different Cornwall account, at HSBC bank (the "HSBC Account"). I reviewed records of that account and learned that the HSBC Account was opened three months before the date that the Cornwall PPPL application was submitted.   The signature card/account application identified the sole signatory as MIKHAELYAN, by his true personal identifying information.   I also learned from reviewing bank statements for the HSBC Account that there were no checks or withdrawals to any person named as a Cornwall employee on the Paylocity report, nor were there any payments to Paylocity or other transfers consistent with paying wages or compensation to others at least for the operation of a

"miscellaneous store retailer" as MIKHAELYAN had represented on the Cornwall PPPL application.

### G.    SUBJECT MIKHAELYAN: Wire Fraud and False Claim re Cornwall EIDL

53.    On July 14, 2020, an EIDL application was submitted to SBA for a $150,000 EIDL on behalf of Cornwall.  The standard form application identified MIKHAELYAN as the contact person, giving his correct address, and stating that Cornwall had 2019 calendar year revenue of $478,000 (nearly the same number as the PPP Payroll Check that MIKHAELYAN had signed a few weeks earlier); had two employees (compared to 82 as MIKHAELYAN had stated on the Cornwall PPP application only two months earlier); and had zero revenue for 2020 (compared to over $1 million as stated on the Form 941 for the first quarter of 2020 that MIKHAELYAN had submitted in support of the Cornwall PPPL application).

54.    A person who identified himself as MIKAELYAN signed the standard form Loan Authorization and Agreement ("LA&A") via the DocuSign online authentication platform in which he represented that Cornwall would, in pertinent part, "use all the proceeds of this [l]oan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020[.]"

55.    On the basis of the applicant's representations, above, the EIDL was approved and its proceeds ($149,900, net of fees) wire-transferred to the HSBC Account.  MIKHAELYAN promptly signed checks to spend-down substantially all of those proceeds,

including checks to MIKHAELYAN's sister, SUBJECT MARIANNA
SARKISYAN and to others not identified on the Paylocity report
as "employees" of Cornwall.

### H.    SUBJECTS MIKHAELYAN and YEMENEJIAN: Wire Fraud, False Claim, and Money Laundering re "Nairi" RRF

56.    In May 2021, an application for an RRF for a
restaurant called "Nairi Meat & Deli" in Hollywood, CA ("Nairi
and the "Nairi RRF") was submitted to the SBA.  The email
contact on the application was "mikaelyanmike@gmail.com."

57.    RRFs were offered to support the restaurant industry
by providing funding to offset significant pandemic-related
revenue loss.  RRFs had specific requirements to ensure
equitable distribution to small business concerns owned by
women, veterans, and socially and economically disadvantaged
applicants.

58.    The Nairi RRF application identified L.D., a woman,
as the president and 100 percent owner.  I interviewed L.D.  She
told me that she did not own Nairi at the time of the RRF
application and that she gave up ownership to MIKHAELYAN and her
ex-husband, YEMENEJIAN, in the early 2000's.  L.D. also stated
that she could not recall whether she or MIKHAELYAN submitted
the Nairi RRF application, but in any event that she gave
MIKHAELYAN permission to do so.  MIKHAELYAN was previously
identified as Nairi's sole owner on an EIDL application.

59.    In further support of the Nairi RRF, the applicant
submitted a 2019 federal income tax return for Nairi that,
according to IRS transcripts that I reviewed, was filed

approximately two weeks before the RRF application was submitted, thus indicating that the return was untimely (i.e., it should have been filed in 2020) and prepared to facilitate the Nairi RRF as opposed to reporting financial activity to comply with tax laws.

60.    The SBA approved the Nairi RRF and in May 2021 wire-transferred the RRF grant proceeds of $1,905,824 to a JPMC account ending in 5870 (the "JPMC 5870"). I reviewed records for the JPMC 5870 and learned the following:

    a.    L.D. was removed as a signatory before the RRF was sought, and MIKHAELYAN was replaced as the sole signatory.

    b.    Within about two weeks after the Nairi RRF proceeds were deposited into the JPMC 5870, YEMENEJIAN, who was not a signatory on the account, wrote 16 checks to MIKHAELYAN (and confirmed as such during an interview), each in the amount of $4,567.50, totaling $73,072.[2]  I know from my training and experience that individuals frequently transact in amounts below $10,000 for fear of drawing suspicion for structuring. The detail of those checks is as follows:

| Date of Check | Amount | Payee |
|---|---|---|
| March 15, 2020 | $9,135 | Mikael Mikaelyan |
| March 31, 2020 | $9,135 | Mikael Mikaelyan |
| April 3, 2020 | $4,567.50 | Mikael Mikaelyan |
| April 10, 2020 | $4,567.50 | Mikael Mikaelyan |
| April 17, 2020 | $4,567.50 | Mikael Mikaelyan |
| April 24, 2020 | $4,567.50 | Mikael Mikaelyan |

___

[2] The bank still honored the checks, even though signed by a non-signatory.

c.   L.D.'s ex-husband, SUBJECT YEMENEJIAN, wrote numerous checks on the account, again even though he was not a signatory, including to "Express Restoration."  I know from reviewing evidence in this case that "Express Restoration" was a purported corporation – likely just a shell – whose president was identified on public records as MIKHAELYAN.

d.   YEMENEJIAN also wrote a $36,504 check to "Humboldt Wholesale," the same entity that SHAW paid out of PPPL funds and that I believe from open sources to be a marijuana cultivation supply business.  I have found no information that Nairi was a marijuana dispensary in addition to being a restaurant.

e.   L.D. also told me that she was remodeling her residence during the time that the Nairi RRF proceeds were received and that a check signed by YEMENEJIAN out of those proceeds, to Bank of America for $104,044, was to pay off a secured loan that she had obtained for home improvements that had nothing to do with Nairi's operation.

f.   All told, YEMENEJIAN signed over 150 checks totaling more than $1.2 million out of the RRF proceeds to a variety of payees, some of which appeared to be shells or, at least, not restaurant suppliers or Nairi employees according to EDD records and the absence of related IRS records.

61.   The SBA required that all RRF recipients submit annually a "post award report" in which the RRF recipient's representative was required to certify that the RRF funds had been used as required, i.e., for restaurant-related expenses.

27

62.    I reviewed a post-award report for Nairi that was
submitted via email from the same email account that identified
on the Nairi RRF application: "mikhaelyanmike@gmail.com."  The
report certified that all RRF proceeds were used for permissible
business-related expenses.  The post-award report did not
mention or separately itemize the $73,072 payments to
MIKHAELYAN, the $104,044 payment to pay off L.D.'s loan from
Bank of America, or the $36,504 payment to the marijuana
cultivation supply business.

63.    In June 2024, during this investigation and shortly
after I first spoke to L.D., MIKHAELYAN called me.  He told me
that he owned Nairi and that he wanted to participate in an
interview that I had scheduled with L.D.  I told MIKHAELYAN that
he could not participate in the interview of L.D. but that I
would separately interview him.  He stated that he should be
present during L.D.'s interview because they "were family."  He
then stated that he only "managed the operations" of Nairi and
would not answer when I asked if he "owned" Nairi.  He repeated
that he was "in charge" of operations and added that YEMENEJIAN
was also involved in running Nairi.

### I.    MIKHAELYAN: Wire Fraud and False Claim re "Rest" EIDL Modification

64.    In May 2020, an EIDL application for $150,000 was
submitted online on behalf of Rest Assured Restoration ("Rest").
The EIDL application showed MIKHAELYAN's true name, date of
birth, and email address that matched that of the RRF
application and related RRF documents.  The applicant stated

28

that Rest was in the "personal services" industry, had 18
employees, and had gross revenues for calendar year 2019 of
$754,000.

65.    Per records that I obtained from EDD, Rest had no
employees and no filings at all.

66.    Per an IRS Fact of Filing request, the IRS had no
records of payroll tax returns for Rest.

67.    The Rest EIDL was approved and its proceeds were
deposited into an account whose sole signatory was MIKHAELYAN.

68.    In late 2021, the SBA received an application to
modify the Rest EIDL by increasing the loan by $350,000.  The
Rest EIDL file "notes" section (that I know contained summaries
of communications between borrowers and SBA loan officers,
including requests for additional financial information)
reflected that MIKAELYAN was advised that he needed to provide
genuine federal income tax returns for Rest for calendar years
2019 and 2020 to justify the modification and to authorize the
SBA to confirm that such returns were filed with the IRS.

69.    I reviewed in the Rest EIDL file what appeared to be
Rest calendar year 2019 and 2020 federal income tax returns
signed by MIKHAELYAN and IRS transcripts that reflected the
filing of such returns.  The transcripts showed that the returns
had not been timely filed but, instead, were filed together in
December 2021, just before the Rest EIDL modification request
was made.  The transcripts reflected that Rest had gross income
for each year of more than $1 million and that Rest owed tens of

thousands of dollars in income taxes.  No taxes were actually paid.[3]

70.    The SBA ultimately denied the Rest EIDL modification request by concluding that Rest had filed its income tax returns solely to qualify for the EIDL modification rather than to reflect genuine financial activity.

### J.    SUBJECT YEMENEJIAN: Wire Fraud and False Claim re "Tiny Tots" EIDL

71.    In August 2020, an application was submitted online for an EIDL for Tiny Tots Childcare, Inc. ("Tiny Tots") for $150,000.  The applicant described Tiny Tots as providing "educational services" and "daycare" since its "start date" of January 1, 2019.

72.    An individual identified as YEMENEJIAN electronically signed an EIDL LA&A for the Tiny Tots EIDL on August 7, 2020, in which the applicant promised to "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020[.]"  Thus, by the terms of the LA&A, TTCI had to be in existence "in the month of January [], 2020."

73.    The Tiny Tots EIDL was funded and, based on my review of SBA records relating to this EIDL, its proceeds were wire-

---

[3]    As more fully described in the concurrently submitted request for issuance of arrest and search warrants for SUBJECT MCGRAYAN, *et al.*, I have probable cause to believe that SUBJECTS submitted fraudulent tax returns to obtain loans in a somewhat creative manner where the returns fraudulently reported substantial income and tax due in order to create the appearance of legitimacy.  No tax was ever paid.

transferred into California Credit Union Account ending in 8996 (the "CCU 8996").

74.    I reviewed records for the CCU 8996 and learned the following:

    a.    The signature card/account application identified YEMENEJIAN as Tiny Tot's authorized representative and provided his true name, date of birth, and driver's license number.  The account was opened with $200 on August 5, 2020, or one day before the Tiny Tots EIDL application was submitted to the SBA.

    b.    YEMENEJIAN was identified on the signature card/account application as the CEO and 100% owner of Tiny Tots. I recognized the signature on the signature card/account application as matching that of YEMENEJIAN's driver's license, a copy of which was also included in the CCU records.

    c.    CCU records also contained a "Statement of Information" ("SOI") for "Tiny Tots Childcare, Inc.," filed with the California Secretary of State on July 31, 2020, or five days before the CCU 8996 was opened.  The SOI, which I confirmed had, in fact, been publicly filed, identified YEMENEJIAN as the sole officer and director of Tiny Tots at the same address for Tiny Tots that YEMENEJIAN had given when he opened the CCU 8996.

    d.    CCU 8996 records show that the Tiny Tots EIDL proceeds of $149,900 (net of fees) were deposited into that account on August 10, 2020.  The prior balance was $200, an amount credited to the account when it was opened days earlier. There was no other deposit activity.

31

e.   As more fully described below, none of the EIDL proceeds was used "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020" because, as described below, Tiny Tots never opened.

75.   An application for an EIDL modification for Tiny Tots was later sought to obtain another $349,900.  In connection with that application, as required and requested by SBA to underwrite the EIDL, the applicant provided a 2019 federal income tax return for Tiny Tots that indicated it had been prepared by C.H. I interviewed C.H., who told me the following:

a.   He is a tax preparer.

b.   He prepared the Tiny Tots return that I saw in the SBA's Tiny Tots EIDL modification file.

c.   YEMENEJIAN came to C.H.'s office and presented a small piece of paper with line items for purported business income and expenses for Tiny Tots.  YEMENEJIAN directed C.H. to prepare Tiny Tots's 2019 federal income tax return using that information.

d.   YEMENEJIAN did not provide any other information to C.H. for the preparation of the return.

e.   C.H.'s practice was to prepare returns for clients based on information provided by clients.  C.H. did not personally verify or audit any such information.  C.H. would simply instruct clients, including by providing cover letters for returns, that the returns that he prepared for clients based

on client's information were simply, in essence, as reliable and accurate as that information.

      f.   YEMENEJIAN signed Tiny Tots's 2019 federal income tax return in C.H.'s presence.

76.   I reviewed that return and learned that, among other things, YEMENEJIAN reported that Tiny Tots had gross revenue from operations for calendar year 2019 of $356,640. Based on my training and experience, and review of the totality of the evidence gathered in this investigation, I have probable cause to believe that YEMENEJIAN submitted made up numbers to C.H. with the intent that C.H. prepare a false income tax return to fraudulently facilitate obtaining this EIDL.

77.   I served a grand jury subpoena on YEMENEJIAN as Tiny Tots's custodian of records and agent for service of process. Through counsel, YEMENEJIAN produced a building lease in response to the subpoena's request for that and other records. I reviewed the lease and learned the following that the lease was executed on August 30, 2018. The lessor was identified as S.B.

78.   I interviewed S.B. and learned the following:

      a.   S.B. told me that he was the lessor for the subject property and that he met YEMENEJIAN to negotiate the lease on behalf of Tiny Tots.

      b.   S.B. stated that the lease with Tiny Tots never took effect because the City of Los Angeles refused to issue Tiny Tots a permit to operate.

c.    S.B. gave me a copy of the lease from his (S.B.'s) files.  The lease was similar to the copy that YEMENEJIAN had produced pursuant to the grand jury subpoena. However, S.B. also produced an "amendment" to the lease that YEMENEJIAN had not produced.  The "amendment" was dated June 2019 and signed by S.B. and by YEMENEJIAN (his signature plainly matched that of known exemplars).  The "amendment" stated that it related to the lease "between [S.B.'s business] and Sarkis Yemenejian dated August 30, 2018," and that "lessee and lessor her[e]by agree to cancel such lease[.]"  The "amendment" also stated that YEMENEJIAN's previously paid security deposit of $30,472 was to be repaid, at YEMENEJIAN's direction, to L.D. (YEMENJIAN's ex-wife).

79.    I reviewed the CCU 8996 records and confirmed that YEMENEJIAN had written S.B.'s company a deposit check of $30,472 out of proceeds of the Tiny Tots EIDL.

80.    Based on my review of the TTCI EIDL records provided by SBA, I learned that YEMENEJIAN paid nothing toward repayment of the Tiny Tots EIDL and concealed from the SBA that Tiny Tots never operated.

**K.    SUBJECT TERZYAN: Wire Fraud, False Claim, and Money Laundering re "Grub House" EIDL and EIDL Modification**

81.    In January 2021, an application was submitted to SBA for a $150,000 EIDL on behalf of "Grub House, Inc." ("Grub House" or the "Grub House EIDL").  TERZYAN[4] was identified on the

---

[4]  In 2016, TERZYAN was convicted in this district of conspiracy to possess 15 or more unauthorized access devices, in
*(footnote cont'd on next page)*

Grub House EIDL application by his true name, Social Security number, and driver's license number.

82.    The application claimed that Grub House's revenue for the 12 months preceding January 31, 2020, was $433,441.

83.    In March 2021, an individual identified as "Arsen Terzyan owner/officer" e-signed the standard form EIDL "Loan Authorization and Agreement" ("LA&A") on behalf of Grub House. Like that of substantially all other EIDL LA&As, the signer promised that "[b]orrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

84.    The Grub House EIDL application also identified a JPMC account ending in 3502 (the "JPMC 3502") as the bank account into which EIDL proceeds should be wire-transferred.

85.    On April 2, 2021, the Grub House EIDL proceeds of $149,900 (net of fees) were wire transferred from the SBA to the JPMC 3502.  I reviewed records for the JPMC 3502 and learned the following:

        a.    The account was opened in October 2019.

        b.    The signature card/account application showed that an individual identified as TERZYAN opened the account by providing his true name and genuine Social Security and driver's license numbers.  The signature on the signature card/account application matched that of TERZYAN's driver's license.

---

violation of 18 U.S.C. section 1029(b)(2) and sentenced to three years in prison.  *United States v. Nazar Daniyelyan, et al.,* CR 15-621-GW.

c.    The balance in the account before the deposit of the Grub House EIDL proceeds was $1,361.

86.    Substantially all of the Grub House EIDL proceeds were spent in 30 days as the balance in the JPMC 3502 at the end of the statement period for the deposit (approximately April 2021) was $524.

87.    I traced the use of the Grub House EIDL proceeds.  I saw 17 checks totaling $102,070, each bearing a signature of TERZYAN that matched that of his driver's license, in amounts consistent with structuring.  None appeared consistent with use as working capital to alleviate damage caused by the Covid-19 pandemic, and at least one such payment was to TERZYAN's sister-in-law, SUBJECT MARIANNA:

| Date Range | Amount | Payee |
|---|---|---|
| April 2, 2021 | $8,500.00 | Terzyan Personal Account |
| April 2, 2021 | $9,892.00 | Terzyan Personal Account |
| April 1 – April 3, 2021 | $50,000 | No Limit Cargo |
| April 6 – April 9, 2021 | $17,700.00 | A███ G████ |
| April 7, 2021 | $9,150.00 | Home Energy Rating |
| April 7, 2021 | $9,150.00 | Hers Raters |
| April 14, 2021 | $14,000.00 | Marianna Sarkisyan |

88.    In April 2021, an application was made for a modification to the Grub House EIDL to increase the total EIDL to $500,000.

89.    I know from my training and experience that the SBA at that time commonly required that applicants submit tax returns and/or provide the SBA with permission (via an IRS Form

4506-T) to obtain directly from the IRS transcripts for the applicant as well as the applicant's tax returns.

90.    The Grub House EIDL file contained an IRS Form 4506-T bearing the electronic signature of TERZYAN.

91.    I reviewed the transcripts that the SBA obtained for federal income tax returns for the calendar years 2018 and 2019. The transcripts showed that Grub House's income tax returns for those years were untimely, submitted on the same day in February 2021, and prepared by the same tax preparer, L.F., whom I know from the evidence in this case was identified as the tax preparer for several other targets including SHAW and MIKHAELYAN.

92.    The chronological activity section on the EIDL application ("note" section) indicated that the SBA declined the EIDL modification because Grub House's tax returns were obtained to qualify for the EIDL modification as opposed to submitted to report genuine financial activity.

**L.    SUBJECT TERZYAN: Wire Fraud, False Claim, and Money Laundering re "Grub House" RRF**

93.    In May 2021, an application was submitted to the SBA for an RRF on behalf of Grub House, Inc. ("Grub House" and the "Grub House RRF").  The "100%" owner was identified as TERZYAN, and provided his residence address at 16719 Lahey St., Granada Hills, CA, as Grub House's business address.

94.    I recently listened to a recording between a creditor and TERZYAN that was made as part of that creditor's underwriting for a loan to TERZYAN.  During that recording,

TERZYAN identified himself by providing the last four digits of his (true) Social Security number that matched that on the Grub House RRF application and the EIDLs described above.  He also gave as his residence address and phone number the same residence address and phone number shown on the Grub House RRF application.  I therefore believe that TERZYAN made the representations on and submitted the Grub House RRF application and will refer to that application as such.

95.    TERZYAN claimed on the Grub House RRF that Grub House's 2019 calendar year gross receipts were $1,423,441 and that he expected to report $463,792 for gross receipts for Grub House for 2020.

96.    On the January 2021 EIDL application for Grub House that TERZYAN submitted, as described above, TERZYAN claimed that Grub House's "Actual 2019 gross revenue" was exactly one million dollars less than the amount now claimed on the Grub House RRF application, or $423,441.

97.    On the Grub House RRF application, TERZYAN identified the JPMC 3502 as the business bank account into which proceeds of the RRF should be wire-transferred (the same account into which the Grub House EIDL proceeds were transferred).

98.    TERZYAN represented on the Grub House RRF application that RRF proceeds would be used solely for Grub House's business expenses such as payroll costs, rent, utilities, food and beverage purchases, construction of outdoor seating, supplies, and other operating expenses.

99.    TERZYAN further represented on that same application that Grub House was at least 51 percent owned and controlled by "[a] socially and economically disadvantaged individual[]."

100.    On May 28, 2021, having approved the Grub House RRF application, the SBA wire-transferred proceeds of $1,864,830 to the JPMC 3502.

101.    I reviewed records for the JPMC 3502 and learned the following:

a.    As stated above, I believe that TERZYAN opened and controlled that account.

b.    The balance in the account was $524 before the RRF proceeds were credited on May 28, 2021.  As described above, substantially all of the deposits to the account from April 2, 2021, to the date of deposit of the RRF proceeds came from the Grub House EIDL proceeds.

c.    Substantially all of the Grub House RRF proceeds were paid out within about three months of the deposit of the RRF proceeds.  Below is a chart that shows the date ranges, amounts, and payees for the first six weeks of activity in the JPMC 3502 following the RRF proceeds deposit, totaling approximately $1.2 million:

| Date Range | Amount(s) | Payee |
|---|---|---|
| June 4 – August 6, 2021 | $286,084.00 | Humboldt Wholesale (Hydroponics) |
| June 8 – June 9, 2021 | $219,804.79 | Hawthorn Hydroponics |
| May 28 – December 31, 2021 | $160,000.00 | Arsen Terzyan's Personal Account |
| July 13, 2021 | $40,000.00 | Ikon Development (Koko Polosajian) |
| July 13, 2021 | $60,000.00 | Standard Home Lending (K███ P████) |
| July 21, 2021 | $50,000.00 | M███ L███ J███ |
| July 22 – August 11, 2021 | $50,000.00 | Pre-Packaging and Moving Service |
| July 13, 2021 | $50,000.00 | Aykem, LLC |
| August 4, 2021 | $50,000.00 | Woodland Shane Matthew |
| June 21 – July 19, 2021 | $14,000.00 | Maria Sarkisyan |
| July 16, 2021 | $13,671.31 | Macy's |
| July 15, 2021 | $3,145.00 | Express Restoration (Mikael Mikaelyan) |

d.    The first two line items refer to payments to
what I believe were marijuana cultivation supply businesses, one
of which (Humboldt Wholesale) was the same such business to
which SUBJECT SHAW paid out of PPPL proceeds as described above.
SUBJECT MARIANNA received $14,000.

102.    RRF recipients were required to certify that RRF
proceeds were used in compliance with RRF rules.    Such
compliance was required via a "post-award report."

103.    Acknowledging on the post-award report that "[a]ny
false statement or misrepresentation to SBA may result in
criminal, civil or administrative sanctions including, but not
limited to: 1) fines and imprisonment[,]" an individual
identified as TERZYAN electronically signed and submitted that
report in December 2021 and represented that all of the Grub
House RRF proceeds were used for Grub House business expenses,
as follows:

| Amount | Eligible Categories |
|---|---|
| $ 317,204.00 | Payroll (including paid sick leave) |
| $ 94,563.00 | Rent / Mortgage |
| $ 31,202.00 | Utilities |
| $ 87,750.00 | Debt Service |
| $ 45,673.00 | Construction of Outdoor Seating |
| $ 16,185.00 | Maintenance |
| $ 16,831.00 | Supplies |
| $ 928,686.00 | Food and Beverage (including raw materials) |
| $ 48,874.00 | Covered Supplier Costs |
| $ 277,862.04 | Business Operating Expenses |
| $ 1,864,830.04 | TOTAL |

104.    EDD records show that Grub House's payroll commenced during the third quarter of 2019 and that it maintained five employees through the first quarter of 2020. Grub House maintained one employee from Q2 2020 to Q4 2020. There was no EDD record of payroll during calendar year 2021. Grub House's EDD account ceased on March 31, 2022.

105.    Based on my review of the JPMC 3502, I have probable cause to believe that TERZIAN at least fraudulently misused and misrepresented on the RRF post-award report payments of $317,204 as payroll expenses, if not in excess of $600,000 more to marijuana cultivation suppliers that he fraudulently mischaracterized as other purported business-related expenses.

M.    **SUBJECT MARIANNA: Wire Fraud, False Claim, and Money Laundering re "Rustwood" EIDL**

106.    On May 30, 2020, an EIDL was submitted on behalf of a shell called "Rustwood Enterprises, Inc." ("Rustwood") for $150,000.  MARIANNA was identified as the contact person by her true name, Social Security number, date of birth, and residence address (the same address as SHAW).  The application identified MARIANNA as the owner of Rustwood and stated that Rustwood had 2019 calendar year gross revenue of $1.6 million and 14 employees.  The application identified a California Credit Union ("CCU") account ending in 7905 (the "CCU 7905") as the account to which the EIDL proceeds should be wire-transferred/deposited.

107.    EDD records and IRS Fact of Filing information showed that Rustwood did not have any employees for the period covered by the EIDL application.

108.    On May 30, 2020, an individual identified as MARIANNA electronically signed the LA&A and, like that of substantially all other EIDL LA&As, the signer promised that "[b]orrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

109.    I reviewed the records for CCU 7905 and learned the following:

        a.    The signature card/account application was signed on April 1, 2020, or about two months before the Rustwood EIDL was sought.  It contained MARIANNA's true name, Social Security

number, and driver's license number, each of which matched that on the Rustwood EIDL application.[5]  I compared the signature on the signature card with that of MARIANNA's driver's license and believe the signatures were written by one and the same person: MARIANNA.  The signature card stated that Rustwood was involved in "landscape design."

b.   There was minimal activity in the CCU 7905 for the months of April and May 2020, such as a transfer from another account in the name of MARIANNA for $500 to open the account and a withdrawal at a Walgreen's store in Van Nuys (which I know was in the vicinity of MARIANNA's residence).  For May 2020, there were approximately $300 in what appeared to be personal expenses (e.g., "Tigranakert Meat Marke[t]" in Van Nuys).

c.   The EIDL proceeds of $149,900 (less $100 fees) were deposited on June 29, 2020, followed by the deposit of an EIDL advance of $10,000 on July 7, 2020.  (I know from my training and experience that the SBA commonly paid EIDL applicants an advance of $1,000 for every claimed employee, up to $10,000, to hold them over until EIDL proceeds were paid; this situation was slightly different as the advance was paid *after* the proceeds.)

d.   There was no significant activity in the account until October, when approximately $100,000 – substantially, if

---

[5]  The signature card contained MARIANNA's prior residence address that MARIANNA verified in mid-2021 in connection with seeking an increase/modification of the Rustwood EIDL, as discussed below.

not solely, EIDL proceeds — was withdrawn in the form of checks
or electronic transfers.  Below is a summary of the payments
that show use of the EIDL proceeds, none of which is consistent
with the operation of a "landscape design" business or with
payment of payroll:

| Date Range | Amount(s) | Payees |
|---|---|---|
| October 1 – October 3, 2020 | $46,495.00 | Express Restoration (Mikael Mikaelyan) |
| October 6, 2020 | $18,500.00 | M■■ K■■■■■ |
| October 16 – December 16, 2020 | $26,565.00 | A■■ G■■ |
| October 19, 2020 | $17,860.00 | Macy's Online Payment |
| November 4, 2020 | $15,122.00 | Ranchito Investments |
| November 25, 2020 | $3,190.00 | Body Design Rejuvenation |
| December 4, 2020 | $5,800.0 | Cornwall Group (Mikael Mikaelyan) |
| December 4 – January 6, 2021 | $22,634.00 | Toluca Commercial, Inc. |
| December 5, 2020 | $15,000.00 | American Mobile Power Solution |
| December 11, 2020 | $7,000.00 | Maria Sarkisyan |
| December 17, 2020 | $17,901.60 | First Bank |
| January 4, 2021 | $49,200.00 | Best Tudor |

110.  In April 2021, MARIANNA applied for a modification
to increase the Rustwood EIDL to $500,000.  The SBA "note"
summary for this application described a detailed conversation
between an SBA representative and MARIANNA, the relevant parts
of which are summarized as follows:

a.  The representative (identified as the "LO" (loan
officer)) stated that the LO "called and spoke w/Marianna
Sarkisyan @ 818-747-5007."  That was the same number that was
provided on the Rustwood EIDL in 2020.

b.  The LO "asked applicant PII questions to verify
information from the initial EIDL, including "date business
established, verified home & business address, verified business

44

entity—stated C corp-business Agriculture." I know from my
training and experience that SBA loan officers commonly verified
applicant's personal identifying information from EIDL
applications in connection with vetting modification requests.

      c.    The LO also verified MARIANNA's identity by
confirming that MARIANNA had received a bankruptcy discharge in
August 2019 and previously lived at the same address that
MARIANNA had provided when she opened the CCU 7906.

      d.    In response to the LO's question about why the
EIDL application stated $1.6 million in gross revenue for 2019
"versus the 2019 [$570,338 in gross revenue] reported on [a tax
transcript that was provided pursuant to a tax information
release form signed by MARIANNA]," MARIANNA explained the more
than $1 million discrepancy by stating that "she completed the
[EIDL] application without her tax accountant."

      e.    The LO explained that the variance was too great
to approve the modification and that "applicant stated she
understood."

### N.    SUBJECT MARIANNA: Wire Fraud and False Claim re Personal EIDL

111.    SBA records show that, on July 13, 2020, fewer than
two months after MARIANNA applied for the Rustwood EIDL, an
online application was submitted for a $150,000 EIDL for
"Marianna Sarkisyan" as a "Sole-Proprietorship" (the "MARIANNA
EIDL"). The MARIANNA EIDL application contained not only
MARIANNA's true name but her true Social Security number and the
same residence address she had provided when she applied for the

Rustwood EIDL in May 2020.  The application claimed that MARIANNA was in the business of "property management/realty" and also stated that MARIANNA's "gross revenues for the twelve months prior to [] January 31, 2020" was $357,000," but mentioned nothing about her association with, or any income derived from, Rustwood.  The MARIANNA EIDL application identified a California Credit Union account ending in 0956 (the "CCU 0956") to which EIDL proceeds should be wire-transferred.

112.  The MARIANNA EIDL was approved and funded in the amount of $150,000 in August 2020.  In July 2021, an application was submitted online to modify the MARIANNA EIDL by increasing it to $500,000 (a net increase of $350,000).  An LA&A for this modification was e-signed by "Marianna Sarkisyan" on July 26, 2021 and, similar to other EIDL requirements at that time, the applicant agreed that "[applicant] will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

113.  I reviewed records of the CCU 0956 and learned the following:

a.  The account was opened in 2013.  The signature card/account application identified the account holder as MARIANNA based on her true date of birth, Social Security number, and driver's license number.  The signature on the card matches that of her driver's license and the numerous checks on accounts associated with her that I have seen during this investigation.

b.    The proceeds of the MARIANNA EIDL modification were deposited into the CCU 0956 on July 30, 2021.

c.    The beginning balance in that account (as of July 1, 2021) was $8,234.  For the several months preceding that date, the account appeared to be largely used for personal expenses (e.g., substantial Amazon and Postmates payments, recurrent $1,820 Chase Auto Lease payments).

d.    The bulk of the EIDL proceeds were used for a variety of expenses not associated with "working capital" for a business including the same substantial Amazon payments, recurrent Chase Auto Lease payments, $8,298 in Aeroflot plane tickets, $55,000 to Rustwood, $15,000 to Pacific BMW, $4,862 to Louis Vuitton, $24,000 to Mercedes Benz of Beverly Hills, and $2,090 to Monolo Blahnik Intl London (high-end shoes).

### V.  CONCLUSION

114.    For all the reasons described above, there is probable cause to believe that SARKIS SARKISYAN, AKA SAMUEL SHAW; MIKHAEL MIKHAELYAN; ARSEN TERZYAN, AKA STEVEN TERZAKI; and MARIANNA SARKISYAN committed the Subject Offenses.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1
by telephone on this  23rd day of
May, 2025.

_Patricia Donahue_
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE